The Government embraces an interpretation of Section 229 of the Chemical Weapons Convention Implementation Act so broad that it makes any malicious use of chemicals of serious federal offense and every poisoning eligible for the Federal Death Penalty. Is it that the reading is so broad or it wants to read it broadly? Is it that the language actually encompasses a broad range of activities and includes what your client did? Well, Your Honor, I think it's a bit of both. I mean, certainly the language of the treaty, of the statute rather, is broadly written. I do think it's amenable of a limited construction that avoids some of the unconstitutional applications and some of the unconstitutional questions or questions of grave constitutional doubt. And we suggested that kind of limiting construction in our briefs. Doesn't the ruling you made on this already have some binding effect on us? I mean, in the panel opinion, we stated what we understood the prohibition to be, said she fell within it, said it was clear. That wasn't addressed by the Supreme Court. What basis do we have for revisiting that now? Well, Your Honor, we're not asking you to revisit any of your prior rulings. Your prior rulings, as I understand it, was to reject a constitutional vagueness challenge to a statute. And I think there's a considerable difference between saying that a statute is so vague that it's unconstitutional and saying that it's... In effect, the merits that we didn't deal with the last time are now before us. Exactly. And I think particularly given that the constitutional merits are now before you when they weren't before, it seems appropriate to consider the possibility of saving construction based on that constitutional issue that wasn't before you. In Missouri... Go ahead. I'm sorry. I thought we had said Bond's actions clearly constituted unlawful possession and use of a chemical weapon under Section 229. That's the language of the opinion. Sure. But, I mean, it's a language of the opinion, if I remember correctly, Your Honor, in the context of rejecting the vagueness challenge. And so, I mean, with respect, I mean, it's obviously an opinion you joined. So, you know, it's with respect that I suggest that that language has to be read in conjunction with the argument that you were rejecting. And there's nothing inconsistent with saying that her conduct was within that statute for But also saying it's, you know, it's a broad statute. It's not so vague that it's unconstitutional. But nonetheless, it's ambiguous enough to admit of a saving construction. But the clearly there doesn't really mean clearly. I'd say the clearly there is a dictum, Your Honor. I mean, you know, again, clear in the context of recognizing a vagueness. You're not arguing ambiguity or vagueness to us. I'm arguing that the statute is sufficiently ambiguous to admit of a saving construction. And I think just to finish the point, the ambiguity, I think, really comes from the word peaceful. You know, of course, it's not my only argument today, to be clear. And if the statute's unconstitutional as applied, so be it. But we generally think courts want to, you know, sort of bend over backwards, so to speak, to interpret a statute to avoid those kind of unconstitutional questions.  Well, that becomes the Constitution. Exactly. I mean, that's, in effect, the merits. Exactly. It leads into the merits. Missouri v. Holland has that one sentence. It also says as an issue, and the last sentence says the treaty and the statute. But you're trying to read Missouri v. Holland as saying, well, the court said, you know, wait a minute. I'm not saying this without qualification. There are things here. For example, birds going across the state of Missouri is minor compared to the national exigency of making sure that we don't have whole populations killed. Right. But is that what Justice Holmes meant, that there's a balancing? Or is he just saying, I'm just not saying something absolute. This, to me, is an easy case. But he really didn't get into the balancing, did he? Well, I think he did, Your Honor, but let me take it in two places. Go ahead. Which is, one, you're right to point to that one sentence earlier in the opinion that the government likes to rely on and could be read if read in isolation to admit a kind of a bright-line rule. Anything goes under the treaty pattern. The reason I don't think that's the right way to read that and read the opinion as a whole is if you look at the sentence immediately before that, what Justice Holmes for the court is rejecting is the notion that the case can be disposed of in favor of the state of Missouri simply by reference to the Tenth Amendment. And he says it is not enough simply to refer to the Tenth Amendment and the reserve powers because there's the treaty pattern. And the rest of that opinion goes on to talk about, as you point out, the treaty and the statute. And it has an analysis that – Actually, when you look at it, it seems like it's talking almost exclusively about the treaty power as opposed to the statute. It's almost like I'm going to tell you about the treaty power, and it's not without qualification. And if the treaty power is valid, then we've got this tag-along that comes automatically. At least the government would say that. Yeah, that's what they'd say. And does it really come automatically? Is your point saying, no, it also has to comply with the constitutional restraints that exist either from the Tenth Amendment or structurally or whatever? Right, exactly. And I would say a couple of things about that. One is, I mean, you know, there is a disconnect here between the statute and the convention. And I would, you know, essentially challenge the government. The possession aspect? Well, there are the detailed differences between possession being covered and the like. But there's also the difference, which is, I don't think the government is going to come up here and tell you with a straight face that if this prosecution was not brought, and certainly not brought by the federal government as opposed to the states, that we would be in violation of our treaty obligations. We would not. So there is a big difference between the scope of the statute as the government interprets it and the scope of the treaty. But that's not the inquiry. Yeah, are you suggesting that necessary means absolutely necessary, that foregoing a prosecution – that you can only prosecute somebody if foregoing a prosecution would put you in violation of treaty obligations? No, the reason I'm making this point is to suggest that there has to be a difference for purposes of the constitutional analysis between the treaty and the statute that implements the treaty. And the reason is twofold. One reason is because they're not coextensive. And as long as they're not coextensive, that seems to me to be a strong reason why you need to analyze the statute independently of the treaty. The second reason why I think you need to analyze them separately, and you can't accept this argument that as long as the treaty is valid, any statute that purports to implement it is valid, is because one thing that Holland doesn't really discuss, but I think is made very clear by subsequent cases, especially the Medellin case, is that you can have a treaty that's perfectly valid. And one of the reasons it's perfectly valid is because it's non-self-executive. So any of the issues about whether Congress properly passed the statute or whether it should be the states that enforce it or the federal government, those questions aren't implicated by the treaty itself. Let's say we accepted that for purposes of argument, Mr. Clement, and that there is a distinction to be made between the treaty and the statute, and we're looking at the statute to see whether it is in fact something you could credibly argue is necessary and proper and doesn't otherwise contravene the Constitution. And that was our operating principle that we were thinking about. If you take that for purposes of discussion, is there something in the statute itself that you think is problematic, or are you really making an as-applied challenge here? I guess I'm having a little trouble because you say things in your briefing like domestic disputes resulting from marital instability and culminating in sunburn are appropriately handled by local enforcement authorities, and it cannot be seriously argued that bond prosecution is necessary to ensure the nation's compliance. Those all seem to be aimed not at the statute, but at the choice to apply the statute to this individual. And I think the answer, Judge Jordan, is both, which is to say we're making both an argument that as applied to my client, the statute's unconstitutional. We're also making the argument, if you're open to it at this stage in the case, to say even if at first glance the statute might seem to go this far, if you interpret the word peaceful with some sort of sensitivity to both the nature of the treaty and the constitutional problems that are raised, then maybe you wouldn't read the statute to reach this far. But either way, one way or another, either because the statute doesn't have to be interpreted to extend this far or because it's simply unconstitutional as applied, we think there is that problem with the statute, and it really inheres in the statute. It's not that there's anything wrong in the abstract with the United States ratifying this treaty. That's not where the problem is. The problem is either at the moment they pass the statute that necessarily went this far or at the point that it becomes applied in this kind of situation. What is your basis for saying it's unconstitutional as applied? Is it because – I mean, it's not like there's a First Amendment right. Are you arguing it's local, so therefore it's Tenth Amendment and states' rights? I mean, I don't get the as applied challenge here. Well, let me try to make an argument by analogy, if you will. As we note in the briefs, we think the logic of the government's position would allow the United States to pass a federal murder statute if it admitted to a treaty about the Convention for the Protection of Human Rights. Now, I would say that if they passed that statute and they applied it in a murder that involved a foreign ambassador or some other obvious federal nexus, I probably wouldn't have an argument as applied that the statute was unconstitutional. But if they applied it to an ordinary sort of garden variety murder, I then think that statute would be unconstitutional as applied. Well, what's to say garden variety? Isn't that Congress's determination that if it fits within this category and we have this kind of chemical, we're going to risk it? We're not going to look at whether the person is an Iraqi or the person is – I mean, what if Carol Ann Bond was a terrorist? Well, and then maybe I'd have a harder as applied challenge. But Congress decided in order to accomplish the goal that the use of these weapons was – chemical weapons was such that this definition of peaceful was sufficient and the breadth of the statute was sufficient. Why is it unconstitutional as applied to her? You're saying your gut tells you it's maybe not – maybe it's a little broader than they might have thought, but they made it broad so as to encompass things that were arguably within because maybe she is Iraqi and maybe she is – but they wanted to encompass that. Why is it unconstitutional? I don't find a principle here. Well, let me say two things. Again, one is that there's the argument that the principle that's amended is that if you apply it so broadly that it criminalizes every malicious use of poisoning, then you've overridden the structural limitations on the government and the division of power between the federal government and the states. The second point, though, is – You can say that about drug – you can say that about the federal drug crimes too. The federal drug crimes are different because the Congress at least recognizes that it's proceeding according to the commerce power and there's a jurisdictional element. And I think that's a big difference, Your Honor, because think of the Jones case in the Supreme Court. There, the Supreme Court was confronting a very domestic family arson, cousin-on-cousin arson. Now, what did they use to unanimously say the statute did not apply there? They used the jurisdictional element in the statute that the House wasn't used in interstate commerce. What's so dangerous about the government's argument here is that because this was passed to implement a treaty, there's no jurisdictional element whatsoever. And in the absence of that jurisdictional element, if the court doesn't either construe peaceful in a way that limits the breadth of the statute or alternatively say it's going to be unconstitutional when it's applied – But the treaty had broad, I mean, verbs in it – retain, acquire, these drugs – I mean, these chemicals. And in order to comply with the treaty – this statute is not so far out there as compared to the treaty. So arguing that it is different and it needs a jurisdictional hook, I think – It is, in effect, your argument that the statute essentially – 229 essentially parrots, with maybe the addition of one word, the convention. However, the structure of federal-state relations is such that as applied to this person, this statute shouldn't apply to a domestic relations dispute. Yes, and there's two ways in which I think the convention really speaks to this directly in the breadth of the statute. One is that Article 7 of the convention, when it talks about states, signatory states passing statutes to implement this, says in accordance with your constitutional processes. And there's no reason why the Pennsylvania laws that are already on the books and make this conduct criminal are not sufficient to discharge our treaty obligations. Can that be the analytical stopping point, though? We have dual sovereignty over all kinds of things. I mean, the state and federal government have overlapping criminal statutes on a wide range of subjects, including murder, if you happen to send a bomb. In interstate commerce, that's the hook, and it blows up somebody just over the line in New Jersey or in Delaware. There's a federal crime there, even though a New Jersey court could just as easily handle that. We are very accustomed to that, so the assertion that Pennsylvania law could handle this and therefore it violates the Tenth Amendment, I mean, how far does that get you? Oh, I think it gets me pretty far, Your Honor, for a couple of reasons. One is all of those other federal statutes you're talking about, with very few exceptions, have some kind of jurisdictional element. And they may be relatively easy to satisfy, but that's not just a trivial matter. They show that there's some particular federal nexus, and that's not the case here unless you're going to say that it's a sufficient federal nexus that there was a malicious use of a chemical. But that seems very far removed from what the convention is directed at. It is a chemical weapons convention. It is not a convention to prohibit any malicious use of chemical. Is it a convention – well, are you putting the rabbit in the hat a little bit there? I mean, when you talk about – and you say in your briefing, too, things like this is a – cuts the heart of state authority to penalize ordinary criminal conduct. Is it really ordinary criminal conduct to use 10-chloro-10-H-phenoxyrazine and potassium dichromate? I mean, these are not – this isn't Pine Sol and it isn't vinegar. These are highly super-toxic chemicals that only somebody like Ms. Bond would be able to get her hands on. And it seems to – I mean, it doesn't have the feel that you're trying to get rid of, oh, my gosh, every cupboard in America is covered by this thing. We're talking about some pretty specific and really, really bad chemicals that she deployed, right? Well, with respect, Your Honor, potassium dichromate is something that you can still get every day if you just go onto the Internet. It's about $10.99 for a bag about that big. And the reason you can get it is because it's useful for photo processing. So it's a little more specialized than Pine Sol or vinegar, to use Justice Alito's example. But nonetheless, it's widely available. This is why the Commerce Clause is a complete misfit here, because nobody's trying to prohibit the commerce in these items. And what converts this into something – makes this otherwise freely available article of commerce a chemical weapon? It's the interstate-formed intent to use it in a malicious way. And the statute just doesn't have to be read that way. I mean, in this context of an international treaty where the other provision of the convention that's relevant is Article 8 that says the whole reason states are supposed to implement statutes is to make criminal to an individual conduct that would be unlawful if undertaken by a signatory state. Well, states don't prison their paramour. I mean, they don't poison their paramour. States don't do that kind of thing. And if you limit it in a sensible way to things that are really warlike acts that make these things sensibly chemical weapons, then it's a – You should say that to Congress. Yeah, I mean, how do we make a distinction between what's just a domestic dispute and what's really starting to creep up there into terrorism? What if Ms. Bond had put this on the doorknobs of her city councilman because she didn't like his pothole policy? It's a political act. One way to interpret statutes to reach that and not this is to accept the government's invitation to have a terrorism overlay, which is exactly what Attorney General Reno told Congress they were passing. I mean, the idea that Congress actually consciously thought that it wanted to criminalize conduct like that, I mean, I think that's strange for Julie. There's nothing in the record. They were told by Attorney General Reno that this was something to deal with terrorists and the like. But they were not told that this was something that would federalize a whole swath of ordinary garden variety. You're limiting principle, though. The argument you're making to us is if you don't put some limit on this, it has to be unconstitutional, this statute. That's how I understand you to be saying it. As applied here, yes. And if it's – I understood you to be making two arguments. One, it's bad as applied to her, but I thought you told me you were also making the assertion that without some limiting principle, it's going to be – all right. I'll take your point. It's unconstitutional not just for her but for anything other than what you call state-on-state terrorism. I would say the question you would ask is the conduct that could be undertaken by a nation-state or a signatory. And that's it, nation-state. So it couldn't be some individual actor or something. I mean, how would we frame the limitation that you think we ought to read into this and have it be not us just legislating from the bench and overriding what Congress actually wrote? What I would invite you to do is focus on the word peaceful. Say that in the context of a statute designed to prohibit conduct that would be illegal if undertaken by a nation-state, that peaceful is obviously in contradistinction to warlike, and that has to give context. Yeah, but peaceful here, you're talking about industrial, agricultural, research, medical, or pharmaceutical. That's not the point. Or any other. I mean, that particular part of the statute is written broadly and inclusively. But this wasn't a very peaceful use, was it? In common parlance, it was not. I'd certainly stipulate that. Then we're rewriting the statute. What's that? Then we're rewriting the statute. I would disagree. I think you're interpreting it. You know, I could cite you a handful of Supreme Court cases that I think would pale in comparison to the interpretive move. A mutual acquaintance of ours, Patricia Mallette, has said that when you read Supreme Court cases, you really need to look at the footnotes. If you look at the Reich case, footnote 36, which talks about the biological weapons statute, and it talks about intrastate use being prohibited. And you look at that statute, and it's really quite like the statute we have here in 229. So it's an example of how they could. I mean, I agree, Your Honor. Maybe it's a throwaway, but I don't. No, no, but I'll take that, and I'll run with it, because here's the thing. I mean, there are three statutes in that footnote, if I recall it correctly, and the other two I think are quite different. Plastic explosives, very different. Nuclear material, very different. Those are things that sort of self-evidently have a federal nexus. Now, I think the biological weapons provision is exactly the same, which is to say I think it's amenable of a saving construction. But when I went and picked up that statute and read it, it struck me that if you read it the same way the government is reading the chemical weapons treaty here, that if I spit on you when I had a cold and I intended to give you a cold, that I just violated the biological weapons treaty. Now, that's crazy. But if I read it, it's the parallelism here. But the question is who then alters that, Congress, when they're told that this is crazy, or do we draw exceptions out of it because it's crazy? I mean, I think that the statute, both statutes, frankly, are amenable of a saving construction. On the other hand, if the court wants to say it's unconstitutional as applied and get Congress's attention in that way for them to amend it, that would be fine, too. But, you know, I mean, the only other thing is, you know, Congress, if it's focused on this problem, could certainly fix the problem and write a better statute. The government wants to rely on cases about the hostage-taking statute, and that's a great illustration because there's provisions in there that make clear that something's an international incident and not an ordinary domestic kidnapping. What's in there? What do you rely on from Lew and Ferreira case? What makes those dramatically different from what we're dealing with here? Exactly what I just talked about. Lew, I think, is our case because if you look at Judge Walker's opinion for the Second Circuit and Lew, what he does is he reads Missouri v. Holland exactly as we're suggesting. He says there is support in that opinion for the idea of a balancing test, and there has to be an important national or international objective or purpose or interest at issue. Then he says, but we don't have that problem here. But why don't you have that problem in the hostage-taking context? Because there's a jurisdictional element there that says that if the kidnapping applies domestically, it's only covered by the statute if the kidnapper or the victim is a foreign national. And that's exactly the kind of jurisdictional element that gives that statute a nexus that ties it to the treaty and is respectful of the state prerogative. As we say in the brief, if my client had locked up this other woman and put her in the closet, would that be a false arrest under Pennsylvania law? You bet. Would that be a kidnapping under Pennsylvania law? Probably. Would it be a violation of the international hostage statute? No, because there's a sensible construction of that statute that's right on its face. Now, look, I'm not going to tell you that I'm not asking you at some level to do Congress's work for you here. I am, but I think that the canon of constitutional avoidance gives you the license to do that. And then we come back full circle to Missouri v. Holland, which, in effect, is the elephant in the room. You're making an argument to us as to how we could interpret Missouri v. Holland. Assuming this case goes back up, which I assume it has a significant chance of doing, will you be making the same argument or will you be making, in effect, the argument that Missouri made back in 1920 that if you can't do with the statute as a tag-along to a treaty and say that it's constitutional, the statute has to meet all the other constraints or restraints of the Constitution? In effect, Your Honor, I'd be arguing both. I mean, my experience in the Supreme Court has taught me that you never ask the Supreme Court to overrule the Supreme Court case unless it's absolutely necessary, and it strikes me that it's not. I mean, I'll be perfectly candid that I sort of understood that Missouri v. Holland stood for this kind of bumper sticker proposition that Congress can do whatever it wants under the treaty clause because that's the way, I think, that's the shorthand for that case. But I think if you actually read the case, it's a much more sensible case. And if I – and for what it's worth, I think if you think about it – I mean, the problem with the case is it's a typical Justice Holmes. It's cryptic. Well, but it's not a typical Justice Holmes opinion in this respect. Maybe this isn't the proper way for a lower court to read Supreme Court cases or an advocate to read Supreme Court cases. But one way it's atypical is it's a seven-to-two opinion on a very conservative court, on cases where he's losing a lot of those cases four to five. Now, why did he get six colleagues to join it? I think because it wasn't this radical far extension of disrespecting states' rights. I think it was a narrow, as-applied decision that focused on a balancing test where the balance went all in favor of the federal government. Birds fly. Birds fly, exactly. All right, thank you. We'll hear from you in rebuttal. Thank you. May it please the Court. My name is Paul Shapiro. I'm an assistant United States attorney. I represent the United States in this case. Good afternoon. Good afternoon. I'd like to start out with Mr. Clement's remark that the Commerce Clause is a complete misfit, and quite the contrary is the case. If that's quite the contrary, why did you abandon it in the district court and get sort of the back of a hand? Abandon it? Abandon it affirmatively in the district court. I don't think we affirmatively abandoned it. Then you're not relying on it. Take a look at Docket 30, page 7. You didn't overlook it. You turned away from it. Title 18, Section 229 was not enacted under the Interstate Commerce Authority. Period. I think that's a statement of historical fact. It is not a forfeiture of a legal position. It is a statement of historical fact that when Congress enacted this statute, it believed it was acting pursuant to the treaty power. Because you took one position in front of us and went to the Supreme Court and took a different one. You took one position in front of the district court on this Commerce Clause issue, and now you're coming back and taking a different one. It's a little bit of whiplash I'm experiencing here. When you go back to the Supreme Court, are you going to have a different position than the one you're arguing in front of us now? Well, I guess, Your Honor, I have in some ways no control over that answer, as I'm sure you're aware. Well, but you're leading with your Commerce Clause argument. Are you saying to us that's your best argument? Your Honor, I think that is the easiest argument for the court to address, simply for the reason that we have a Supreme Court case that is on point that is very recent, as opposed to a Supreme Court case that is right on point that is very old. We have a Supreme Court case that is on point that is very clear, as opposed to one that is on point that is written by Justice Holmes. The Gonzales v. Straits case, the one you're talking about. Yes, Your Honor. So what's your response to the assertion made by your opponent, at least hinted at by a couple of members of the Supreme Court, that there doesn't seem to be any indication at all that Congress was intending to limit trafficking in chemicals. And so to analogize this to what is clearly an economic activity, drug trafficking, is just a really painful stretch. I completely disagree, and here's why. It's different from marijuana. I agree with that, because in the case of marijuana, it's easy. Congress made the decision that it was useless and it wanted to eradicate it, as Raich's opinion makes clear. But marijuana is simply one component of a larger regulatory scheme, which is in large measure why the Supreme Court found the regulation appropriate, and Raich makes that clear. And as Raich also makes clear, in the case of the vast majority of drugs. But 229 doesn't require proof that the chemical weapon moved in interstate commerce. Nor does the Drug Control Act. And indeed, the Raich case, you're talking about marijuana that was homegrown, home dispensed, and home used. It never touched interstate commerce, unlike the chemicals in his case. It was the drug control statute's attempt to deal with an illicit economic activity. There's nothing even hinting of such a purpose in this instance. This is non-peaceful, war-like activity. And, Your Honor, let me get my thought out, just because the parallel is actually very, very close. What the Drug Control Act does, as Raich makes clear, it deals with a situation where many drugs, such as, for example, cocaine, have illicit uses and licit uses. And it regulates those by, in the case of marijuana, saying it will be stamped out. But in the case of cocaine, saying most uses are prohibited, but it may be prescribed in limited circumstances. Is your very, very late turning to this argument a consequence? Is it a tacit admission that if you don't have a jurisdictional hook other than necessary and proper, you're in trouble? No, Your Honor. Well, necessary and proper is implicated in both. But I think there are two alternate theories. As I said, one of them is – and they both are, from the perspective of this court, governed by the Supreme Court. In one case, though, we're dealing with a very recent precedent, which tells us that when you are dealing with a commodity, which chemicals are unquestionably commodities, and when you look at the convention that we are dealing with, it makes clear that what the international community and what Congress was concerned about was a – Was regulating commerce in chemicals? Absolutely, because it was dealing with multiple problems at the same time. Wasn't it just pretty clearly saying, hey, we don't like chemical weapons, not look out for the pine saw. That's got ammonia in it. That's a dangerous thing. Actually, Your Honor, what they were saying was chemicals have two sides to them in the same way that cocaine does. Some is good and some is bad. And in order to get the benefits for all mankind that accrue from international trade in chemicals, from scientific research in chemicals, from the free flow of information across state boundaries and across national – It was a chemical weapons treaty to make that broad policy statement. I'm sorry? That was enacted by the – under the treaty. I'm just confused as to why you're fleeing from the treaty powers and trying to shoehorn this into – I mean, this is so far different from drugs which hit individuals across the spectrum, rich, poor, et cetera. And here you're talking about, as the government itself said when this was passed, this is dealing with terrorism, warlike activity. It's dealing with numerous things. And indeed, if you look at the message that the State Department sent to the Senate when this was proposed for ratification, it explained that one of the primary concerns was the promotion of international trade in chemicals, and the only way to accomplish that – if countries and companies are concerned that their chemicals, like potassium dichromate, will be misused, they will be reluctant to make them available on international – Back to Judge Jordan's first point. If this is your opening salvo and your best argument, why in the world didn't you make it before? I mean – and then we go to Judge Rendell's point is maybe you ought to just get onto the treaty power and – The short answer is we should have done. I mean, there's no other answer than that. We should have done. From the – But you made a calculated decision not to do it for probably some very good reasons. It has – there's a lot – you used to say in deal world it has a lot of hair on it to say that this passes muster under the Commerce Clause. The adjective clearly, which is strewn so liberally in your brief, doesn't fit very well here, but assuming that we thought that wasn't a comfortable fit, you've said that you believe that this stands up just fine under what you had argued before, and I guess I'm interested in knowing what your response is to Mr. Clement's argument that there's got to be a limiting principle on this, that it can't just be accepted that this is necessary and proper to implement the treaty. Otherwise, we're going to be getting into federalism problems. What's the response to that? There are two responses. The first response is, of course, there are checks. There are the affirmative checks in the Constitution that apply to every statute, whether passed pursuant to a treaty power or any other power. Congress cannot pass – well, I guess it can pass them, but an unconstitutional law cannot survive. And whether that law is in violation of an affirmative obligation or a structural limitation of the Constitution, whether it's passed pursuant to treaty power or any other power. So are you accepting the amicus's argument here that the treaty power is one thing and the president is free to say, sure, we'll enact this treaty and that it's a completely different thing to look at the statute and that the president could constitutionally say, I'm going to bind the country to something which, in fact, Congress can't do. And those two things are utterly different. Now, maybe I've misread the amicus argument, but that's part of what I understood them to be saying. Is that what you're saying?  The cases make clear that this court has a role in reviewing the treaties, but that role is extremely limited and, indeed, Could you address Mr. Clement's structure argument? That is that even if the language of the treaty and then the statute that follows it track reasonably well, is it necessary and proper to invade the province of the states with respect to what is, in effect, a domestic violence crime or attempted murder? Well, Your Honor, the short answer is yes, because the treaty itself makes the possession of this substance or the acquisition, stockpiling, and use of this substance and the statute tracks those requirements dead on, a violation of the treaty and then a violation of the statute. I thought you could get some of these – in fact, she did order the chemicals, one of them, over the internet. That's true. So anybody who gets this over the internet is in violation of federal law? No, if used for a purpose inconsistent with the statute. A peaceful purpose. Or if used for a non-peaceful purpose. I guess what I'm asking is, are you accepting the for a peaceful purpose overlay that is being urged on us by Ms. Bond's counsel here, that the statute has to be read in a way that would prevent it from applying to someone like Ms. Bond? Oh, no, it clearly – it applies to her. There is no question about that. This court said so in reading the plain language. Congress said so repeatedly in writing the statute. And indeed, there's a provision of the statute that demonstrates that fact. Did we say so? Are we free to go back on this? I mean, that was my opening question to Mr. Clement. Have we already spoken on this and can't really walk away from it, or are we free to revisit and talk about this? Well, you've got two questions in there, Your Honor, and the answer to the first question is yes, and the answer to the second question is yes. But did we rule based just on vagueness as compared to reading it so as not to run afoul of the intent, if you will, as Mr. Clement would urge? I mean, the answer is that you said what you said in the context of a vagueness challenge, but you said what you said. And what you said was Bonn's actions thus clearly constituted unlawful possession and use of a chemical weapon under Section 229. You also said there was no doubt that Bonn's conduct violated Section – excuse me – no doubt that a, quote, person of reasonable intelligence would know that her conduct violated Section 229. It's sort of like a tale of two arguments because we haven't even mentioned Missouri v. Holland with you. Could you – could the government have enacted Section 229 absent the treaty? Forgetting the Commerce Clause for the moment, let's assume it's out. Could Congress have enacted 229 just on its own? Are you asking me whether there is some power other than the commerce power and other than the treaty power that would support it? Yes. Standing here, I can't think of one. That doesn't mean that there isn't one, but I – And let's assume – let's go as to the treaty power. In Missouri v. Holland, there was no mention of an 1836 case, Mayor of New Orleans, which appeared to say that Congress's limited powers cannot be enlarged by the treaty power. There's no – And if the court was overruling Mayor of New Orleans, it didn't mention it. Although, I guess – I don't know that there's an inconsistency because the treaty power is a separate power, and that power is – right? That power itself is not enlarging a power. It simply – it is a power in the same way that the commerce power is a power, and it allows Congress to pass it. Can you read Mayor of New Orleans that way? I mean, doesn't – the language of it seems to be saying just what Judge Ambrose said. Congress has got certain defined powers, and you don't get to expand those powers by this, this, or the treaty power. Right. I don't know that it's – I don't know that it's an expansion. And in any event, Missouri v. Holland has been repeatedly quoted and relied on. Now, you take – let's just go to the Reed v. Covert in 57. And basically, the takeaway, at least that I have, is that a treaty cannot take away your constitutional rights under the Bill of Rights. If that's the case, these persons had rights under the Bill of Rights, that a treaty cannot take it away. Can a treaty then add to the powers given to the federal government, the enumerated powers? I don't view it as add and subtract, Your Honor. I view it as the treaty power is a delegated power like every other. But it's in a different – you know, it's Article II, Section 2, the treaty power. And now we're getting into the dichotomy that the amicus has urged on us, which is that's different from implementing statutes. That the president can go out and make whatever treaty he may want to make under Article II, but when it comes to saying what Congress can and can't do, that doesn't confer new power or jurisdiction on the Congress of the United States to suddenly start regulating things which otherwise it would not have any power to regulate. That's – again, I don't want to say I fully understand all the arguments here, but that's what I understand them to be saying. What's wrong with that argument, particularly in light of the mayor of New Orleans case? The way I understand Missouri v. Holland and all the cases, including Lew and Ferrara and Lara and all the others that have relied on it since, the way I make sense of it is there really are two questions that get asked with regard to the constitutionality of any statute. The first is, did Congress have a power, some power, to pass it? And then the second is, is it constitutional? And those are different inquiries. There's something to be understood from Justice Holmes' comment that the treaty in Missouri v. Holland didn't contravene any prohibitory words he found in the constitution, that it was – yeah. Right. So he uses this language about some invisible radiation from the Tenth Amendment. It's hard to know whether he's saying that sarcastically or whether he really meant maybe there is some emanation, some penumbra that's got used by somebody else in another context. But is it fair to look at Missouri v. Holland as not sweeping so broadly as to say anything that Congress could possibly do in light of the treaty is okay? Well, I guess we haven't ever – no court has ever come across one. So, I mean, the easy answer is yes, you can say that. So far, it's never happened. And it's important to understand why, because so far you have been – we have been talking about treaties being made by the president, but of course that isn't really how it happens. And there are structural limitations, important structural limitations that go into the making of treaties, which is, of course, that the president has to negotiate it and then the Senate has to approve it by two-thirds. And that's, as current events tell us, an extraordinarily difficult accomplishment. And then if you add into it the requirement that a statute be passed, now you've got both houses of Congress and the president all over again. And you can imagine that the framers may very well have thought – and our experience has taught us in 200 years that with those kinds of limitations, with the kinds of representation of all the states in the process, the odds of coming up with something that would take you beyond the bounds, whatever those bounds may be – Are you making an argument that this case is like Lou because in Lou the court said, well, whatever that limit is, we're not there, so we don't have to worry where the limit is? Yes, Your Honor. And then what's your response to Mr. Clement's assertion that, no, this isn't like Lou because in Lou there's some jurisdictional hook. There's an international aspect embedded in the scheme that ties it to the treaty, and there's nothing like that here. Because there need not be a jurisdictional hook any more than there is in the drug context, any more than there is in the biological weapons statute context. Jurisdictional hooks can be helpful in the case of a commerce clause but are not, we know, necessary. But in the case of a treaty, the question is what are we dealing with? We've got Lopez which says you don't federalize what is only local under the commerce clause. You're in effect saying – go ahead. Well, you don't – Lopez is a little bit more nuanced than that because Lopez says you don't federalize what is local except in the context of a commercial – of a regulation of a commercial environment. How about Morrison? How about Morrison? Morrison. Morrison, the violence against women's rights. And actually when – in Reich they said that that principle, the Supreme Court said that that principle was never addressed and never challenged. The concept, the underlying concept of the commerce clause, and we're back to it. I mean, I know you steered me away from it. We're back there. I'm sorry. But the underlying concept of the commerce clause is economic regulation, and there is nothing more economic than the international trade in chemicals. And Congress not only could have, but as the preamble to the convention makes clear, did in fact decide that the way to promote international trade in chemicals and knowledge of chemicals was to prohibit – Was to prohibit chemical weapons. Yes, to prohibit the use of them as chemicals. The idea was certain chemicals are extremely useful and also extremely dangerous, like potassium dichromate. So if you have a chemical that is useful in photography and you want it readily available but also is extremely dangerous, your concern is I want it available. I want it to travel across international boundaries. I want it to be available for scientific research. This is remarkable to me, counsel, that this is an argument you only figured out after the district court, after the Third Circuit ruling, sort of, kind of in the Supreme Court and now in front of us. All I can tell you is the Solicitor General's office is much smarter than I am. I mean, I don't mean to say I believe you when you are modest like that. I'm sure you're right on top of this. But it's passing strange that this is an argument that emerges only now and yet it's so obvious that this is what Congress did that we should be afraid. Well, I don't – that is not what I said. I didn't say it was obvious that that was what Congress did. There's a world of difference between saying Congress had the power to do it under the Commerce Clause and it is easily justified under the Commerce Clause and saying that Congress thought it was doing it under the Commerce Clause. And I am not standing here saying that. In fact, what I'm telling you is that we told you before Congress didn't think it was doing it under the Commerce Clause. It clearly didn't. Nobody thought it was, but the fact that it didn't think it was exercising its commerce power doesn't mean that it wasn't. Isn't it kind of an uncomfortable thing to say even though nobody involved in the process ever thought that this was a basis on which to act? After the fact, maybe kind of, yeah, ooh, I see it now. That must be something that justifies it. How can that – I mean that – talk about a recipe for unbridled federal power if you can get in your time machine and go back and say if only you'd seen it, you'd see that this is good when you're acknowledging that at the time nobody considered this a basis for federal action. Nobody. No, what I did say was – remember that the preamble and the statements all the way along make clear that one of the motivating purposes was international trade. What I said was Congress thought it – I mean it's pretty clear to me that Congress thought it was exercising its treaty power. But the question of what power Congress thought it was exercising has never been determinative or even particularly significant because this court, remember, is sitting in judgment on the actions of two other branches of government. And the question is not what power Congress thought it was exercising. The question is did it have the power. It almost sounds as if what you're saying is that if this case goes back up, and as I noted it's likely to do so, that we the government are on pretty thin ground with respect to the treaty power and Missouri v. Holland, and we better darn well come up with another argument even though we didn't make that argument before because we didn't think it was a very good argument ostensibly. I'm just telling you that's my conjecture. You're not filling us with confidence that if we were to rule in the government's favor on the treaty aspect of this that we'd be on solid ground. And not only because we've had the rug pulled out from us once before, but because by leading with the Commerce Clause argument, it really does imply there's not a lot of confidence on your side of the courtroom that this is a sound constitutional interpretation of the treaty power. My conjecture is that this court is bound by Missouri v. Holland, and that exactly as I said the last time I was here, this court has no discretion about the application of Missouri v. Holland to the facts of this case. We have the ability to interpret Missouri v. Holland, and your opposing counsel has given a plausible interpretation, and you obviously can disagree with it. Your Honor, I agree that in lieu they said there are words that you could read as balancing. And there are other arguments such as made by the amicus Professor Rosencrantz that argues that Missouri v. Holland is actually misunderstood. There are academic arguments that say lots of things, Your Honor. There is no case that has in fact applied Missouri v. Holland as a balancing case. What he cites as his best shot is a case saying we don't have to reach it. We don't have to reach it. It would be an interesting question if we did. If that's as good as it gets, my argument to this court is – your opposing counsel believes is as good as it gets before us, but if you go back up to the Supreme Court, Missouri v. Holland is back in full play, right? Certainly the Supreme Court, unlike this court, has the authority to overrule its own precedents, if that's what Your Honor is asking. No further questions. Thank you. Thank you. Your Honor, there's a couple of points in rebuttal. I'd like to start with the forfeiture point. I think that what the government said on that page 7 of its response to the motion to dismiss the indictment speaks for itself. But I think there was a clear, a valid waiver of the argument becomes more clear if you read that sentence in conjunction with the motion to dismiss that was filed. Because the motion to dismiss right out of the box cites Morrison and cites Lopez and says that this is not valid commerce legislation. And then in response to that, on page 7, what the government says is that's irrelevant, this is treaty legislation, and it doesn't once talk about Morrison, doesn't talk about Lopez, even though those were put in play in the motion. You've made the pitch, and I assume you stand by it, that this Commerce Clause argument doesn't have any legs, right? Absolutely. And, you know, there are consequences, in a sense, of the concession that Congress wasn't thinking about the Commerce Clause when it passed this legislation. If it was, it would have passed a very different statute. I mean, when you think about the statute, what became criminal here was not purchasing potassium dichromate from Amazon.com. It was the point at which possession or use became combined with the intent to use it maliciously. That's when the chemical became converted into a chemical weapon. And so it's not the commerce that triggers anything. I mean, my friend on the other side talks about international trade in chemicals. If that's what the Congress passes a statute to regulate that, I won't be here because, for one thing, the Foreign Commerce Clause gives ample authority to do that. But there's nothing that gives the government the authority to federalize crime without any kind of jurisdictional element. And I'd like to – Do you concede, though, that had Congress wanted to, it could have said, hey, anybody who uses chemicals that pass in any way in interstate or foreign commerce and uses them maliciously is in violation of this law and subject to the XYZ penalty? You know, it might be – if they'd done that, then that's probably a statute they can pass. But it wouldn't have been without consequences because it would have given me textual language to hook a limiting construction on. And I also don't think that's what they would have done. If they would have focused on that, maybe they would have thrown in the transmission in interstate commerce to give them a commerce hook. But then if they really focused on that, I'm not sure they would have just said maliciously. I think they might have used other language that narrowed the scope of the statute. But in any event, the reason that language is missing is because Congress, as my friend concedes, had no conception they were regulating commerce. They were trying to implement a statute. And the absence of that jurisdictional element, I think, really is extraordinary. I mean, he talks about the provision in Raich that didn't have a jurisdictional element, but the Supreme Court told you why that was okay, which is every other aspect of commerce in this particular substance is forbidden. So Congress at that point doesn't care whether it's traveled in interstate commerce. It's trying to obliterate it from interstate commerce. And that, of course, is a complete misfit. I mean, you know, Justice Scalia just about fell out of his chair when he thought the government was suggesting the statute was designed to rid interstate commerce of vinegar. So the Commerce Clause really is a complete misfit in this context. Let me get back to the basic treaty power clause. Given what we know about the treaty, Senate approves the treaty, Congress approves the legislation that implements the treaty, prosecutions occur under that statute. I'm still trying to get at the basis for saying that a given prosecution is unconstitutional, i.e., that this is unconstitutional as applied to your client. This is not a First Amendment case. This is not another case where she has some constitutional right to be free of this federal prosecution. What is it that makes this prosecution of her under what is clearly enacted pursuant to the treaty power unconstitutional? Well, I think she does have a right to be free from prosecution under a statute that Congress has no authority to pass as it applies to her conduct. Or are you saying Congress has no authority to pass as applied to her conduct? She's deployed these highly toxic chemicals in a way clearly designed – in a weapon way. I don't know what you call it. I mean, it was designed to injure and kill. Well, first of all, it's stipulated in this case that it was really intended to kill. So, I mean, that was stipulated below, I believe. So, well, it's certainly nothing that we've ever conceded. So, I don't think you should make this an attempted murder case. The conduct fits within the statute and the statute is enacted and properly implements the treaty. So, Congress clearly had the power to enact this statute as it is. What is it that says as to any given prosecution under a statute that we second guess and basically rewrite the statute? Is that what you're asking us to do? No, Your Honor. And what I'm trying to do – I mean, it's really my argument is respectful of the Supreme Court's jurisprudence that says that you don't let them bring a facial challenge. What's the principle? What's the principle, the as-applied principle that, gee, Congress said this, but you know what? I don't think it really meant it. So, as applied to her, it's unconstitutional. No, Congress didn't have the power to pass this statute and apply it to her. Now, there might be other applications of this statute. Why did it not have the power? Because it lacks an enumerated power to pass this statute as applied to reach her conduct. But it follows form with the treaty. How do you say it doesn't have the power? With respect, it doesn't follow the form of the treaty. There are non-technical differences that are included in this case, including reaching possession. Well, possession, retention, acquisition is covered in the treaty. Use is covered in both, for example. I'm sorry? Use, for example, is covered in both. Well, absolutely. Some things are. But then again, the convention is – And she used it. But the convention is directed at acts that would be criminal by a state, and the convention says that you pass statutes consistent with your constitutional processes. And what we're saying is that Congress, to the extent it passed a broad statute that reaches this conduct, acted inconsistently with its constitutional processes. And you can't get any cover from the convention when the – I don't think you could anyways, but especially a convention that says, look, do this consistent with your constitutional processes. But we don't do that. We don't look at the person and the specific crime and parse it out in that way. We look at whether the statute was passed pursuant to the treaty, and if it was, and it was proper, and there's a prosecution under it, who are we to say that this is – even though it clearly fits within the language, that it's not within their power? I just can't get there. Well, I'm sorry, Your Honor. I must be being inarticulate. I mean, if Congress – and the way the government interprets this, this is not a chemical weapons statute. It is a criminal use of chemicals statute. And if Congress tried to pass a criminal use of chemicals statute under the treaty and necessary power clauses, it would lack the authority to do it. That is our submission, and I think it's right, because if Congress, absent the treaty, would have tried to say, we're going to make it unlawful across this country to use chemicals in a criminal act, I don't think they have the power to do that under the enumerated powers. If they tried to make every murder involving poison a federal murder, I think they would lack the authority to do that. And the reason is because you'd look in those – But that's not this case. We have an international situation involving use of chemical weapons and a treaty that's clearly within the power of the President and the Senate to pass and the statute to implement it. We don't have a – we don't have a federal murder statute here. But we do as interpreted by the government. I mean, if – you know, a federal poisoning statute, and if you poison – you know, you poison your significant other in the privacy of your own home, you've just violated a federal statute. And if you do it in a state that doesn't have a death penalty, you've just been subjected to the federal death penalty. I don't think Congress can do that, and I don't think Congress can – if it can't do it otherwise, can arrogate itself to the power by having the Senate ratify a treaty. And if I – Let me ask a question because you said there was nothing in the treaty. The treaty was just for nation states. I'm having a hard time putting my hand right on it. I thought that I had read that the treaty actually talks about and requires that natural persons be prohibited from doing anything that the state – that signatory states could do. Right. No, I – we're saying the same thing. It's – but that's all. It's not that private parties are prohibited from using chemicals at all or using chemicals criminally. The individuals are prohibited from doing something that would be unlawful if undertaken by a nation state. Well, certainly, and I don't know why a nation state would be really upset with Ms. Bond's victim, but if they sent an agent into the country to smear her doorknob with this potassium dichlorate, whatever the name is, that that would fall within the confines of the treaty, right? Well, but you've just assumed away my best argument, which is to say states don't do that. States might want to – Well, we don't – you know, that is your best argument, and here's where it gets down to a problem for us. You want us to draw a distinction between what you view as purely domestic kinds of crimes and political acts, and maybe that line is not a really easy one to draw. And more to the point, maybe we're not the ones to be drawing it. Well, I do have something responsive on that, which is Congress has already drawn that line, and they've drawn it for purposes of determining whether or not a violation of 229 is a crime of terrorism. And for purposes of defining what a crime of terrorism is, they say that conduct that's not a crime of terrorism would be a crime of terrorism if you're basically undertaking the conduct to influence government action. And so that's not a line you would have to just make up. You could just basically impose that line. And the other distinction I think that admits of itself rather readily is, you know, nation states use chemicals indiscriminately. You know, the concern of this statute is that you're going to, you know, drop chemicals on a civilian population indiscriminately. States don't single out somebody because they got pregnant with their husband for the use of chemicals. And I think if you respected that basic difference, you could take a... It's only mass use of weapons. You don't concede that there could be something that felt right square in the tree that would be a targeted use of a chemical weapon. If it's targeted to a government or to influence government policy, then I'd say that still fits because... It's motivation. It's both. It's both. And don't think motivation is an odd fit for the statute because what makes a chemical a chemical weapon is if it's for an intent to use for a purpose other than permitted by the statute. So the statute's all about intent. If I could just make two brief... Let me just ask one question about just what if you are in New York and you get anthrax in New York and you use that anthrax to try to kill Tom Brokaw of NBC by sending him something in the mail. Didn't get it out of state, got it in state. Would that... 229 would apply, but you're saying it would be unconstitutional as applied to this particular defendant? I don't think so, Your Honor, because I think there's certain chemicals, and I think anthrax is one. I think sarin gas would be another. There's certain chemicals that by their nature you can't target. I mean, they have the same basic characteristic that would make an action the kind of action... But how am I supposed to draw a distinction between anthrax and potassium dichromate? Well, I don't think anybody's told you that potassium dichromate is sort of, you know, kind of of its nature sort of weaponized in the sense that, you know, it disperses broadly, and there's certainly nothing about this case that suggests that's right since, you know, this... Well, other things was a very... But the authors didn't draw that distinction. Well, I think they may have in the words peaceful and distinguishing peaceful in this context, which means non-warlike. And, again, you know, I'm not telling you that it's there just leaping out from the statue. What I'm saying is just like the biological weapons provision could be interpreted to cover spitting with a cold, What if, for example, you could find a way to have potassium dichromate put in multiple places very quickly and hurt many people in the population? Would that fit under the statute? Sure, but then it would be multiple victims, indiscriminate, and there'd be a sense in which that chemical was weaponized. And, you know, maybe that's one way of thinking about this is, you know, is this a statute about chemical weapons, as it says, or is it a statute about chemicals? And it seems to me that to convert chemicals into chemical weapons, you need something more than... So let's just say we have somebody who's, you know, incompetent mentally, but knows enough about potassium dichromate to put it on the subway, gets it in New York, and puts it on subways in New York City, and a number of people are injured or killed. Yeah, I think that would be covered. But that's because nothing different happened there. She smeared it on the seat. No, no, but there is something different. It's the intent, and again, this is a statute that's all about intent, and it's an intent to use chemicals in precisely the way that the framers of the convention and statute are worried about, which is the indiscriminate use of chemicals to injure people. And that's the kind of stuff that not only have nation states done, but that's the concern of the statute. The concern of the statute is just not... Every time somebody gets really hacked off at their husband and starts poisoning their food, that's not an international incident. And again, it's not a construction that's sitting there, but I think it is amenable of that construction. And I can say just two things before I sit down. One is, this isn't the only government lawyer who's nervous about the treaty clause. We put that colloquy in a reply brief with the Solicitor General when Justice Scalia was incredulous about whether he can really amend the Constitution with the Senate in Zimbabwe. And, I mean, the government is, I think, rightly worried about an aggressive reading of Missouri v. Holland. The last thing I'll say is, you know, my client has no hope to get a second Supreme Court case out of this case. She has the modest hope of getting out of the federal penitentiary before she's served. Six-year sentence, which is longer than she could possibly serve. Or to deal with her supervisor, at least, too.  Let me ask you, in connection with Missouri v. Holland, the amicus and I also, other academics, including Mr. Eastman, have said that in light of, read, in light of what we can glean from Lopez, one can argue that Missouri v. Holland isn't as absolute, forgetting the balancing test for the moment, isn't as absolute as the government argues. It doesn't straitjacket you. What is your response to that? I would say that's right, and I would add two other cases to the mix. One is Medellin, which I think, by drawing the distinction between the treaty, which can be non-self-executing and the implementing legislation, informs this. And the other case is the United States, or bond against the United States in the Supreme Court. I mean, once you have a world where the Supreme Court recognizes that the Tenth Amendment is primarily about protecting individual liberty, and in cases like Prince and New York against the United States, the Supreme Court recognizes that the Tenth Amendment is the vehicle where you can make an argument that an act of Congress is not necessary and proper and intrudes too far in a direction that interferes with individual liberty. Once you kind of understand all that, then I don't think you need to get to the balancing test or overrule Missouri v. Holland. I think you can just say, look, Missouri v. Holland basically says that, in a particular context, you don't interpret the treaty power to – you interpret the treaty power consistent with the Constitution. As understood there, there was no sort of real kind of independent Tenth Amendment claim there. There was really nothing there. It was just the state's proprietary interest in birds. And now you add all the cases you talked about where the court has recognized that there are real structural limits. I think that's a way you can harmonize Missouri v. Holland with Mayor of New Orleans and the subsequent cases and say, look, nobody's really said, and Missouri v. Holland doesn't say that you absolutely can do something in the face of something pushing back in the Constitution that you can't otherwise do because there was really nothing significant pushing back because the state's interest was so weak. So I think it's a little bit back to the balancing test, but I do think if you – as you do, you're bound by Supreme Court precedents, but you're bound by all of them. And I think – Let me – I'm intruding on your negotiations, but this is – when you say you've got pressure pushing back, what are we to make of the statements in Reed and in Missouri that say, in effect, the Tenth Amendment really doesn't have anything to say about this because there is – this isn't something delegated to the states. The Constitution expressly delegates this power to the federal government. So once you're in that treaty-making mode,